IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WALLACE MITCHELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 3:06-cv-0621 ) ) Judge Thomas A. Wiseman, Jr. |
| RIVERGATE ACQUISITIONS, INC., dba PLANET KIA, a/k/a OCCUPANT OF 1201 NORTH GALLATIN PIKE, MADISON, TENNESSEE 37115, | ) ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM**

Plaintiff Wallace Mitchell ("Mitchell") filed a detainer action against Defendant Rivergate Acquisitions, Inc. ("Rivergate") in the General Sessions Court for Davidson County, Tennessee on June 5, 2006 seeking to remove Rivergate from his property located at 1201 North Gallatin Road in Madison, Tennessee ("the Leased Tract"). Rivergate filed a Notice of Removal on June 20, 2006 removing the case from the State Court to the United States District Court for the Middle District of Tennessee under the authority of 28 U.S.C. § 1332 based on diversity and the amount in controversy exceeding $75,000.00. (Doc. No. 1.) This case is properly before this Court.

On April 27, 2007, Rivergate filed its Motion for Summary Judgment (Doc. No. 20) and Memorandum in Support (Doc. No. 21) arguing that it is entitled to judgment as a matter of law because the term of the Lease has not expired and there are no defaults warranting Rivergate's eviction. On April 30, 2007, Rivergate also filed its Statement of Undisputed Material Facts (Doc. No. 24-1) in support of its motion. In response, Mitchell filed a Statement of Disputed Material Facts (Doc. No. 28), as well as his opposition to the Motion for Summary Judgment (Doc. No. 29) on May 18, 2007. Rivergate filed a reply on May 31, 2007 (Doc. No. 30). For the reasons set forth below, the Court will DENY Defendant Rivergate's Motion for Summary Judgment.

**I.    FACTUAL & PROCEDURAL BACKGROUND**

Mitchell owns real property located at 1201 Gallatin Pike in Madison, Tennessee upon which are

1

located buildings and improvements in which Rivergate conducts a portion of its Kia automobile dealership ("the Rivergate Improvements"). According to Rivergate, the property was leased to Crystal Sales, Inc. ("Crystal") on August 1, 1998 pursuant to a written Lease Agreement ("Lease") negotiated between Mitchell and Mr. William B. Tanner ("Tanner") on behalf of Crystal. As drafted, the Lease had a five-year initial term and an original termination date of July 31, 2003. However, the tenant had the option to renew the Lease for four (4) additional periods. Rivergate alleges that Crystal renewed the Lease and on June 15, 2005, assigned the Lease to Rivergate.

Mitchell claims that (1) he and Tanner never executed a written lease agreement on the property, thus, he argues Crystal was a month to month tenant, and (2) even if they had executed a written lease agreement, Crystal did not exercise its right to renew the Lease prior to the assignment to Rivergate in 2005. Accordingly, Crystal did not have a lease to assign to Rivergate, and Rivergate is also a month to month tenant. (Doc. No. 17, at 1).

Rivergate claims that Mitchell's actions satisfy the Statute of Frauds and that Crystal renewed the Lease until 2008, thus, making the assignment from Crystal to Rivergate valid. Rivergate also claims that since June of 2005, Rivergate has operated a Kia automobile dealership on the premises, has paid rent to Mitchell pursuant to the terms of the Lease, and should be allowed to remain on the Leased Tract. (Doc. No. 17, at 1.) A review of the facts in the light most favorable to the non-movant, Mitchell, follows.

### A. Negotiations and Initial Lease

In the spring of 1998, Tanner, on behalf of Crystal, called Mitchell regarding his interest in leasing the property at 1201 North Gallatin Road. (Doc. No. 21, at 2.) Tanner and Mitchell negotiated the terms of a lease over the telephone including an initial lease term of five (5) years, options to renew, the monthly rental amount during both the initial five (5) year term and any renewal terms, the use of the Leased Tract for the operation of an automobile dealership, and the party responsible for paying property taxes. (Doc. No. 21, at 3.) On or about June 24, 1998, Tanner delivered to Mitchell a check for $10,000.00, which he identified in the memo line as "earnest money."[1] According to Mitchell, the men were then supposed to meet in person and draw up a lease, but never did. (Doc. No. 24, at 3.)

---

[1] Mitchell contends that the check tendered by Tanner was merely earnest money, arguing that it does not indicate in any way that it was a "lease deposit" as Rivergate argues. According to Rivergate, the $10,000 tendered by Tanner was for the "lease deposit," as provided in Section 3.2 of the Lease, with

2

Subsequently, Mitchell met with his attorney Homer Ayers ("Ayers"), and Ayers drafted a lease intended to reflect Mitchell and Tanner's oral agreement. (Doc. No. 22-3.) Mitchell signed this initial lease agreement on August 25, 1998 and Ayers sent it to Tanner for his review and signature (the "Original Lease"). (Doc. No. 24, at 4.) Upon receiving the Original Lease, Tanner made handwritten changes to the document with regard to ownership of any Rivergate Improvements (Doc. No. 22, Ex. C, at ¶11), possession of the Rivergate Improvements (Doc. No. 22, Ex. C, at ¶12) and the assignment of the Lease (Doc. No. 22, Ex. C, at ¶17). Tanner also changed the name of the tenant to Crystal, LLC. Specifically, Tanner made the following pertinent changes to the Original Lease:

*ORIGINAL LEASE SIGNED BY MITCHELL*

> 11. <u>EQUIPMENT, FIXTURES AND SIGNS</u>: All fixtures, equipment and signs used on the premises which have been supplied to or installed on the premises by Tenant will, at all times, be and remain the property of the Tenant. The Tenant will have the right to remove same or any part thereof from the premises during the term of this Lease, or at the expiration thereof. Any improvements or additions or new buildings added or any real property changes or additions already on the premises or added by the Tenant will remain the property of the Landlord at the end of the original term and will be the property of the Landlord at the beginning of any extension, renewal or month tenancy or lease.

*REVISED LEASE SIGNED BY TANNER*

> 11. <u>EQUIPMENT, FIXTURES AND SIGNS</u>: All fixtures, equipment and signs used on the premises which have been supplied to or installed on the premises by Tenant will, at all times, be and remain the property of the Tenant. The Tenant will have the right to remove same or any part thereof from the premises during the term of this Lease, or at the expiration thereof. Any improvements or additions ~~or new buildings~~ added ~~or any real property changes or additions already on the premises or added~~ by the Tenant will remain the property of the ~~Landlord at the end of the original term and will be the property of the Landlord at the beginning of any extension, renewal or month tenancy or lease~~ *Tenant*.

*ORIGINAL LEASE SIGNED BY MITCHELL*

> 12. <u>CARE AND SURRENDER OF THE PREMISES:</u> The Tenant will not commit any act or engage in any practice in or about the premises which would cause injury or damage to any person or property and will use reasonable care and diligence to keep and maintain said premises in a neat, orderly and sanitary condition, free of rubbish, dirt, other debris, snow and ice. The Tenant further agrees that it will commit no waste on the premises. Upon any termination of this Lease, the Tenant will surrender possession of the premises, without notice, in as good condition as at the completion of the building structure and any improvements located on the property, reasonable wear and tear and casualty beyond the control of the Tenant being excepted.

---

$5,000.00 to be credited against the monthly rental until exhausted and $5,000.00 to be held by Mitchell as a security deposit until the expiration of the initial lease term and either applied to rent during the first option term or refunded to Tanner. (Doc. No. 22, at ¶ 3.2.)

3

*REVISED LEASE SIGNED BY TANNER*

> 12. <u>CARE AND SURRENDER OF THE PREMISES:</u>  The Tenant will not commit any act or engage in any practice in or about the premises which would cause injury or damage to any person or property and will use reasonable care and diligence to keep and maintain said premises in a neat, orderly and sanitary condition, free of rubbish, dirt, other debris, snow and ice.  The Tenant further agrees that it will commit no waste on the premises.  Upon any termination of this Lease, the Tenant will surrender possession of the premises. ~~without notice, in as good condition as at the completion of the building structure and any improvements located on the property, reasonable wear and tear and casualty beyond the control of the Tenant being excepted.~~

*ORIGINAL LEASE SIGNED BY MITCHELL*

> 17. <u>ASSIGNMENT AND DEFAULT</u>:  The Tenant shall not assign or sublet the premises without the express written consent of the Landlord, but such consent shall not be unreasonably withheld.  However, no assignment or subletting and no acceptance by the Landlord of any rent or any sum of money from any assignee or sublessee shall release the Tenant from any of its obligations under this Lease.

*REVISED LESAE SIGNED BY TANNER*

> 17. <u>ASSIGNMENT AND DEFAULT</u>:  The Tenant shall ~~not~~ assign or sublet the premises without the express written consent of the Landlord. ~~but such consent shall not be unreasonably withheld~~.  However, no assignment or subletting and no acceptance by the Landlord of any rent or any sum of money from any assignee or sublessee shall release the Tenant from any of its obligations under this Lease.

On September 28, 1998, Tanner signed the revised lease initialing his handwritten alterations ("Revised Lease").  It is unclear whether Mitchell actually received the Revised Lease with Tanner's handwritten changes in 1998, but it is undisputed that Ayers received the Revised Lease with Tanner's changes and signature sometime after September 28, 1998.[2]  (Doc. No. 22-3, at 7.)   According to Ayers, Tanner informed him that he had sent the Revised Lease to Mitchell, but the address to which he sent it was no longer Mitchell's address and Ayers cannot say whether Mitchell was informed of Tanner's changes to the document (Doc. No. 24, at 7.)  According to Mitchell, Ayers informed him that Tanner wanted to make changes to the Original Lease and since he did not agree to Tanner's changes, Mitchell did not believe that he and Tanner had anything more than a temporary lease.

### B. The Rivergate Improvements

After signing the Revised Lease with his handwritten changes, but before Mitchell learned of Tanner's revisions, Tanner began building a Kia dealership on the Leased Tract – one of the Rivergate

---

[2] Regardless of whether Mitchell or Ayers received the Revised Lease with Tanner's handwritten changes, there is no dispute that Mitchell would not have been able to read the changes.  (Doc. No. 24, at 5:11-13.)

4

Improvements.  Mitchell admits that he watched the dealership being built, but claims that he thought it was being built with the agreement that the building would be his building as provided in the Original Lease.  (Doc. No. 22-3, at 7.)  As set forth above, the Original Lease that Mitchell signed, prior to Tanner's revisions, provided that any improvements to the property would remain the property of the Landlord (Mitchell) at the end of the lease and would also be the property of the Landlord at the beginning of any extension, renewal or month tenancy or lease (Doc. No. 22, Ex. C, at ¶¶ 11 & 12.)  Both Mitchell and Ayers were aware of the Rivergate Improvements, and once they learned of Tanner's revisions to the Lease they became concerned that there was a misunderstanding as to the ownership of the Rivergate Improvements and Tanner's rights as a tenant.  They expressed this concern in a letter from Ayers to Tanner on February 9, 1999 that Tanner was making the improvements without an executed written lease.  When asked whether Ayers, Mitchell or anyone else associated with the Leased Tract voiced any objections to anyone on the property regarding construction of the Rivergate Kia between February 1999 and June of 2005, Ayers testified that he was not aware of any written or oral conversations concerning the issue.  (Doc. No. 22-3, at 8.)

### C.  Second Proposed Lease in 1999

On February 9, 1999, Ayers sent Tanner a letter advising him that the Original Lease sent to him in August of 1998 was not executed due to the changes Tanner made before signing it.  The letter explained to Tanner that he was only renting the Leased Tract on a month to month basis because Mitchell did not agree with the changes Tanner made to the Original Lease, thus the parties had not executed a written lease agreement.  (Doc. No. 24, Ex. F.)  Ayers enclosed with the letter two copies of the Original Lease.[3]  Ayers requested that Tanner execute both of the originals and return them to him. Ayers said that once he received the executed originals he would have Mitchell also execute them and they would then send one copy of the executed lease agreement to Tanner.

By letter of February 28, 1999, Tanner responded that he had executed the lease on September 28, 1998, apparently referring to the Revised Lease, and he thought his attorney had sent Mitchell's copy to Ayers.  (Doc. No. 24, Ex. H.)  Tanner sent a second copy of the signed Revised Lease containing his handwritten changes and noting that his company had paid the taxes on the Leased Tract.  In response,

---

[3] These copies of the Original Lease included the change of the name of the Tenant to Crystal, L.L.C., but otherwise remained the same.

5

Ayers sent a letter to Tanner stating that "the written changes made by you on the original Lease were not acceptable with Wallace Mitchell" except the change of the Tenant's name to Crystal L.L.C., and if Ayers and Mitchell did not receive a fully executed original of the Lease within twenty (20) days of the letter, they would assume that Tanner rental of the Leased Tract was on a month to month basis. (Doc. No. 24, Ex. I.) The letter again included two originals of the Original Lease with the name properly changed to Crystal L.L.C.. There is no indication that Tanner ever executed the second proposed Lease in 1999 or otherwise indicated his acceptance or denial of the Original Lease to Mitchell or Ayers.[4]

### D. Rental Payments and Property Taxes

Although, as noted above, the Revised Lease included substantive changes to several provisions of the Original Lease, but the Revised Lease did not change the terms regarding the rent. (Doc. No. 22, ¶ 3 & Doc. No. 24-1, ¶ 3.) According to the Lease, the monthly rental payments would increase $100 each year from $3800 the first year to $4,000.00 the third year to $4,200.00 the fifth year. (Doc. No. 22, Ex. C, at ¶3.) Mitchell admits that he received and deposited rental checks every month from 1998 until at least 2005. (Doc. No. 22, Ex. A, at 14-15.) The monthly rental payments corresponded to the terms of the Lease and Mitchell accepted the funds. (Doc. No. 22-2, at 15.) In addition, Tanner paid the property taxes on the Leasehold Tract as set forth in the Lease. (Doc. No. 24-14, at ¶9.1.)

### E. "Renewal of Lease" and "Assignment" to Rivergate

According to Mitchell, Tanner reclaimed his deposit when the Lease ran in 2003 (Doc. No. 22-2, at 6-8.) According to Mitchell, he had one telephone conversation with Tanner regarding Tanner's interest in renewing the lease after 2003 until 2008, but they did not agree to anything. (Doc. No. 22-2, at 20.)

From the correspondence between Tanner and Mitchell in 1998 and 1999 it does not appear that the parties agreed on certain provisions of the Lease. However, there are several provisions, pertinent to the issues presented herein, that were not altered by Tanner's handwritten changes including the provision governing the term of the Lease:

---

[4] The Court notes that it can only consider the facts before it in the Record and the only factual evidence contained in the Record at this time was presented by Defendant Rivergate in support of its Motion for Summary Judgment, which includes only selected portions of Mitchell's and Ayers' depositions. Surprisingly, Mitchell has not responded to Rivergate's motion or its factual support with any additional testimony or any evidence to fill in the gaps in the factual record.

2. TERM:

2.1 The term of this Lease shall be for a period of five (5) years and shall commence on the 1st day of August, 1998, and shall terminate on the 31st of July, 2003.

2.2 Notwithstanding. Tenant shall have the option of renewing the Lease for four (4) additional periods of five (5) years, with the renewal terms to begin on the expiration of the original term of this Lease on the rentals, as hereinbelow set forth, but otherwise, on the same terms and conditions contained in this Lease Agreement.

2.3 In the event Tenant continues to occupy the premises after the last day of the term hereby created, or after the last day of any extension of said term, and the Landlord elects to accept rent thereafter, a tenancy from month to month only shall be created and not for any longer period.

On May 10, 2005, James M. Balthrop ("Balthrop"), an attorney for Mitchell, responded to a letter Mitchell had received on May 2, 2005 from Tanner regarding the Leased Tract and whether Mitchell had agreed to renew the Lease dated August 1, 1998.[5] (Doc. No. 24, Ex. J.) According to the letter from Balthrop, Tanner has asked Mitchell on several occasions to give him an answer on extending the Lease beyond the first five years and the answer was always no.[6] Balthrop reiterated to Tanner that Mitchell had not agreed to renew the lease agreement dated August 1, 1998 and that he regretted any understanding Tanner might have to the contrary. According to Balthrop, the time to renew the Lease had expired and Mitchell's tenancy was on a month to month basis. The letter concluded with the statement that "Mr. Mitchell quiet [sic] understandably, believes this is to his advantage and does not wish to renew the lease for a lengthy period." (Doc. No. 24, Ex. J.) There is no further correspondence between the parties indicating whether Tanner requested to renew the Lease in writing or whether Mitchell agreed to renew the Lease at any time either orally or in writing.

On or about June 15, 2005, Crystal executed a Bill of Sale in which it purported to convey to Rivergate the Revised Lease with Tanner's handwritten changes, as well as the leasehold improvements on both 1303 Gallatin Pike North and the Leased Tract at 1201 Gallatin Pike North. (Doc. No. 14, at 1, 2, 20.) Since that time, Rivergate has maintained a Kia automobile dealership on the Leased Tract and has

---

[5] The Court can only assume, for purposes of this motion that the May 10, 2005 letter accurately reflects the statements made in the May 2, 2005 letter from Tanner to Mitchell as the letter of May 2 is not in the Record before the Court.

[6] It is unclear whether the parties were referring to the Original Lease signed by Mitchell or the Revised Lease as signed by Tanner in their correspondence and communications regarding "extending" or renewing the lease.

7

paid monthly rent to Mitchell pursuant to the provisions of the Lease as described above. (Doc. No. 3-1, at ¶ 7.)

On November 23, 2005, Balthrop, as counsel for Mitchell, wrote a letter to Mr. Michael Goodbread, Jr. ("Goodbread"), an attorney for Rivergate, informing him that Rivergate was in possession of the premises without a valid lease and was therefore a month to month tenant. (Doc. No. 9, at ¶ 1.) Mitchell demanded that Rivergate vacate the premises by January 1, 2006. In response, Rivergate sent a letter to Mitchell purportedly to serve as notice of their option to renew the Lease dated August 1, 1998 for an additional five (5) years, which would move the expiration date to July 31, 2013 absent any future exercise of the remaining renewal terms. (Doc. No. 23-2, at 1.)

### F. Procedural History

On June 5, 2006 Mitchell filed a possession only unlawful detainer warrant in General Sessions Court for Davidson County, Tennessee seeking possession of the premises based on the contention that Rivergate was occupying the premises as a month to month tenant with no valid lease. (Doc. No. 9, at ¶¶ 5-7.) Rivergate removed the matter to this Court based on diversity jurisdiction.

On July 6, 2006, Rivergate filed a Motion for More Definite Statement (Doc. No. 6) and Memorandum in support (Doc. No. 7) asking the Court to order Mitchell to submit a pleading with a more definite statement of his claim. Mitchell filed a More Definite Statement of Claim on August 14, 2006 (Doc. No. 9) and a Motion to Dismiss and Remand to General Sessions Court (Doc. No. 10) asking the Court to remand the suit back to the Court of General Sessions or alternatively, enter an Order evicting Rivergate from the premises. Rivergate filed a response (Doc. No. 13) to Mitchell's Motion on August 28, 2006. On October 10, 2006, the Court denied Mitchell's motion finding that the $75,000 amount in controversy requirement was met based on the potential loss to Rivergate in this matter. (Doc. No. 17).

On April 27, 2007, Rivergate filed its Motion for Summary Judgment (Doc. No. 20) and Memorandum in Support (Doc. No. 21) arguing that it is entitled to judgment as a matter of law because the term of the Lease has not expired and there are no defaults warranting Rivergate's eviction. On April 30, 2007, Rivergate also filed its Statement of Undisputed Material Facts (Doc. No. 24-1.) Mitchell filed a response to Rivergate's Statement of Disputed Material Facts (Doc. No. 28), as well as his opposition to

8

the Motion for Summary Judgment (Doc. No. 29) on May 18, 2007. Rivergate filed a reply on May 31, 2007 (Doc. No. 30).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the burden of showing an "absence of a genuine issue of material fact as to an essential element of the nonmovant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

### A.  Introduction

Mitchell alleges that Rivergate is a month to month tenant with no signed, valid and existing lease and therefore, the Court should enter an Order evicting Rivergate from the property and returning possession of the Leased Tract and the Rivergate Improvements to Mitchell. (Doc. No. 9, at ¶ 9.) Rivergate contends that Mitchell's actions of accepting rental payment in conformity with the provisions of the Lease for over eight (8) years and of allowing Crystal to spend thousands of dollars on the Rivergate Improvements without objection satisfy the requirements of the Tennessee Statute of Frauds and created an enforceable Lease between Mitchell and Crystal, Rivergate's predecessor-in-interest, as a matter of law. (Doc. No. 21, at 1-2.) Rivergate also contends that by his actions, Mitchell has also waived any argument that Tanner did not exercise the option to extend the Lease agreement on behalf of Crystal for an additional five (5) years or until 2008. (Doc. No. 21, at 9.) According to Rivergate, the term of the Lease has not expired and there are no defaults warranting its eviction, thus, it is entitled to judgment as a matter of law. Surprisingly, Mitchell does not respond to this argument except to point out that there are disputed material facts regarding whether he and Tanner ever entered into a written lease and even if they did, whether there was a meeting of the minds regarding the principal terms and conditions of the lease. (Doc. No. 28.)

9

### B. Whether There is a Valid Lease Agreement Between Mitchell and Tanner.

It is well established in Tennessee that, in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and not be contrary to public policy. "Under general principles of contract law, a contract 'must result from a meeting of the minds of the parties in mutual assent to the terms.'" *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 286 (Tenn. 1996) (citations omitted). It is fundamental that a contract is enforceable only to the extent that it is assented to by the parties. *State v. Clements*, 925 S.W.2d 224, 227 (Tenn. 1996) (citations omitted).

In addition, to be enforceable, contracts for the making of any lease for a term longer than one (1) year must satisfy the Statute of Frauds, which requires that the parties' contract be evidenced by a memorandum or some other writing and be signed by the party to be charged therewith. (Tenn. Code Ann. § 29-2-101(a)(4).) "[T]he memorandum, in order to satisfy the Statute of Frauds, must contain the essential terms of the contract, expressed with such certainty that they may be understood from the memorandum itself or some other writing to which it refers or with which it is connected, without resorting to parol evidence." *Lambert v. Home Fed. Sav. & Loan Ass'n*, 481 S.W.3d 770, 773 (Tenn. 1972) (quoting 49 Am. Jur. Statute of Frauds, §§ 353, 363-64). Thus, to satisfy the Statute of Frauds, a party may rely on multiple documents evidencing the same transaction provided that the writings on their face relate to one another.

In the present case, Rivergate acknowledges Mitchell's claim that he never agreed to Tanner's changes in the Revised Lease. However, according to Rivergate, "[b]y endorsing and negotiating rental checks whose amounts confirmed to the provisions of the Lease, Mitchell confirmed the formation of a mutually binding written lease agreement," which satisfied the requirements of the Tennessee Statute of Frauds. (Doc. No. 21, at 7.) In support of this contention, Rivergate relies on *Batey v. D.H. Overmyer Warehouse Co.*, 446 S.W.2d 686 (Tenn. Ct. App. 1969), a case in which the Tennessee Court of Appeals enforced the lease agreement over the objection of the landlord, despite the fact that the landlord had not signed it, based on the finding that "the endorsement of defendant [landlord] upon the [rental] checks, *unexplained by evidence*, is as effective an approval of the lease as a signature thereon." *Batey*, 446 S.W.2d at 693 (emphasis added). According to Rivergate, the facts in *Batey* are virtually identical to the

10

facts in the case at bar and based on the holding in *Batey*, "[t]he September 1998 written lease agreement complies with the Statute of Frauds as an enforceable writing evidencing the parties agreement." (Doc. No. 21, at 9.)

Although the Court agrees with Rivergate's contention that the Statute of Frauds does not require that the contract be contained in a single document and that under certain circumstances, endorsement of monthly rental checks may constitute acceptance of a lease agreement, Rivergate ignores several glaring distinctions between this case and *Batey*. In *Batey*, the lease agreement at issue was negotiated by the parties, and three copies were sent to the tenant with a request that the tenant sign the leases and return them to their offices. The note specifically stated that "[a]ll of the changes have been incorporated into this lease and should be agreeable to both parties." 446 S.W.2d at 692. The tenant signed and returned two copies of the lease along with his check for rent for the first two months. The landlord endorsed and deposited the check, as well as other rental payment checks in subsequent months. However, sometime after the tenant signed the lease and began paying rent, it became clear that the landlord never signed the lease. The landlord then attempted to require tenant to agree to an entirely different lease, which would put the tenant at a considerable disadvantage. *Batey*, 446 S.W.2d at 691-92.

Unlike the situation in *Batey*, in the present case there is ample evidence in the record to refute Rivergate's contention that Mitchell's act of endorsing and negotiating rental checks affirmed the existence of an enforceable written agreement. First, it is undisputed that several key terms, terms which govern the very matters at issue, of the Original Lease drafted and signed by Mitchell are substantively different from the terms in the Revised Lease signed by Tanner. (Doc. No. 22 & Doc. No. 24-14.) In contrast, in *Batey*, there was ample evidence that the parties negotiated the terms of the lease and that the unsigned lease sent to the tenant expressed a previous oral agreement; the only issue was that the landlord did not actually sign the lease agreement. Moreover, the court in *Batey* specifically recognized that there was no evidence to refute the "obvious implications" of the note from the landlord accompanying the copies of the lease and the landlord's subsequent acceptance and endorsement of the rental payments. 446 S.W.2d at 693. Such is not the case here.

The record contains both testimony and evidence documenting the fact that the Original Lease Mitchell agreed to and signed was quite different from the Revised Lease signed by Tanner and returned

11

facts in the case at bar and based on the holding in *Batey*, "[t]he September 1998 written lease agreement complies with the Statute of Frauds as an enforceable writing evidencing the parties agreement." (Doc. No. 21, at 9.)

Although the Court agrees with Rivergate's contention that the Statute of Frauds does not require that the contract be contained in a single document and that under certain circumstances, endorsement of monthly rental checks may constitute acceptance of a lease agreement, Rivergate ignores several glaring distinctions between this case and *Batey*. In *Batey*, the lease agreement at issue was negotiated by the parties, and three copies were sent to the tenant with a request that the tenant sign the leases and return them to their offices. The note specifically stated that "[a]ll of the changes have been incorporated into this lease and should be agreeable to both parties." 446 S.W.2d at 692. The tenant signed and returned two copies of the lease along with his check for rent for the first two months. The landlord endorsed and deposited the check, as well as other rental payment checks in subsequent months. However, sometime after the tenant signed the lease and began paying rent, it became clear that the landlord never signed the lease. The landlord then attempted to require tenant to agree to an entirely different lease, which would put the tenant at a considerable disadvantage. *Batey*, 446 S.W.2d at 691-92.

Unlike the situation in *Batey*, in the present case there is ample evidence in the record to refute Rivergate's contention that Mitchell's act of endorsing and negotiating rental checks affirmed the existence of an enforceable written agreement. First, it is undisputed that several key terms, terms which govern the very matters at issue, of the Original Lease drafted and signed by Mitchell are substantively different from the terms in the Revised Lease signed by Tanner. (Doc. No. 22 & Doc. No. 24-14.) In contrast, in *Batey*, there was ample evidence that the parties negotiated the terms of the lease and that the unsigned lease sent to the tenant expressed a previous oral agreement; the only issue was that the landlord did not actually sign the lease agreement. Moreover, the court in *Batey* specifically recognized that there was no evidence to refute the "obvious implications" of the note from the landlord accompanying the copies of the lease and the landlord's subsequent acceptance and endorsement of the rental payments. 446 S.W.2d at 693. Such is not the case here.

The record contains both testimony and evidence documenting the fact that the Original Lease Mitchell agreed to and signed was quite different from the Revised Lease signed by Tanner and returned

to Mitchell. Rivergate ignores this evidence, choosing to focus its attention on the fact that after Tanner signed the Revised Lease with his changes and began construction, Mitchell accepted rental payments in conformity with paragraph 3.1 of the Lease. (Doc. No. 21, at 8-9.) According to Rivergate, Mitchell knew that Tanner was building an automobile dealership on the property in accordance with their discussions of the summer of 1998 and by accepting rental payments Mitchell confirmed the formation of a mutually binding written lease. However, Mitchell testified that he did not agree to Tanner's revisions in the Revised Lease and as soon as he became aware of Tanner's proposed revisions in 1999, which was after Tanner had completed the Rivergate Improvements, Mitchell again requested Tanner sign the Original Lease with the original terms. (Doc. No. 24 & Doc. No. 24-14.)

Further, contrary to the situation in *Batey*, there is no evidence that Mitchell's failure to object to the Revised Lease before February of 1999 was simply an attempt to require Tanner to agree to an entirely different lease at a considerable disadvantage to Tanner. Rather, the evidence, viewed in the light most favorable to Mitchell, clearly shows that Mitchell objected to the Revised Lease as soon as he learned of it because he wanted the Lease to reflect the terms in the Original Lease including the provision that "any improvements or additions or new buildings added or any real property changes or additions . . . added by the Tenant" to remain the property of the Landlord at the end of the original term of the property and to "be the property of the Landlord at the beginning of any extension, renewal or month tenancy or lease." (Doc. No. 22, at ¶11; Doc. No. 24-14, at ¶ 11.) These facts coupled with Mitchell's testimony that he did not protest during construction of the Kia dealership or any of the other Rivergate Improvements because he thought it was being built with the agreement that the building would be his building as provided in the Original Lease he signed before Tanner made his handwritten changes and at a minimum, he thought he was being paid rent based on a month to month tenancy until the parties had a validly executed lease create an issue of fact as to whether the parties had the requisite meeting of the minds necessary to create an enforceable lease agreement either in 1998 or 1999. (Doc. No. 22, Ex. C, at ¶¶ 11 & 12.)

Moreover, a review of both the Original Lease and the Revised Lease show that the provision governing the rental amount and payment periods is the same in both. Thus, even if the Court did find that Mitchell's actions of accepting and endorsing "rental payments in conformity with the provisions of the

12

Lease . . . affirmed the existence of an enforceable written agreement which satisfies Tennessee's Statute of Frauds," there is clearly a triable issue of fact as to which of the two lease agreements governs the relationship between the parties and applies to the issues before this Court.  Accordingly, even if the Court did find that there was an enforceable written agreement between Mitchell and Crystal/Tanner, as discussed above, Crystal's right to assign the lease of the premises to Rivergate without Mitchell's written consent depends on which lease agreement applies.  (Doc. No. 22, ¶ 17 & Doc. No. 24-14, ¶ 17.)  Based on the record, the Court is unable to determine whether Crystal's purported assignment of the rights to the Leased Tract and the Rivergate Improvements to Rivergate in 2005 is a valid and enforceable assignment.  Accordingly, the Court finds that summary judgment is inappropriate on the issue of the terms of the Lease.

Based on a review of the record, in the light most favorable to the non-movant, the Court concludes that there is a genuine issue of material fact remaining as to whether Mitchell and Crystal entered into an enforceable written Lease agreement, which it could assign to Rivergate.  The Court reaches this conclusion because it cannot determine as a matter of law, based on the testimony of Mitchell and Ayers and the correspondence between Ayers and Tanner regarding the Lease, that Mitchell agreed to accept Tanner's handwritten changes to the Original Lease, which fundamentally changed the legal obligations of the parties and their rights.  (Doc. No. 22.)  Accordingly, the Court need not consider the issue of whether Crystal or Tanner had or exercised the option to renew the Lease beyond the expiration date of August 1, 2005.

## IV.     CONCLUSION

For the reasons set forth above and for good cause shown, the Court hereby DENIES Rivergate's Motion for Summary Judgment.

An appropriate Order will enter.

*[signature]*
Thomas A. Wiseman, Jr.
Senior United States District Court Judge

13